IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| DEAN CHRISTIAENS,<br><br>          Plaintiff,<br><br>vs.<br><br>CORECIVIC OF TENNESSEE, LLC, and DOES 1-10, Severally, or in the Alternative, Jointly,<br><br>          Defendants. | **CV-22-111-GF-BMM**<br><br>**ORDER** |

## BACKGROUND

Plaintiff Dean Christiaens ("Christiaens") worked for CoreCivic of Tennessee, LLC ("CoreCivic") in Shelby, Montana. (Doc. 50 at 3); (Doc. 37 at 7); *see* (Doc. 6 at 2). CoreCivic hired Christiaens as a Warehouse Manager on November 9, 2015, (Doc. 14 at 2) and promoted him to Unit Manager in early 2020 (Doc 50 at 6).

Christiaens began seeing a therapist, Tonya Carpenter ("Carpenter"), for anxiety and depression in 2019. (Doc. 50 at 5.) Christiaens has Anxiety, Depression, Bi-Polar Disorder, and Post-Traumatic Stress Disorder. (Doc. 51-9 at 9-10.) Christiaens verbally told supervisors, including Warden Peter Bludworth

1

("Bludworth"), of his therapy appointments. (Doc. 51-9 at 16-17.) Christiaens also told his coworker Daniel Mayhugh about his mental health therapy appointments. (Doc. 50 at 45.) Bludworth knew that Christiaens suffered from stress and anxiety. (Doc. 50 at 33.) Christiaens sometimes missed appointments with Carpenter because Chief Henson or Assistant Warden Catherine Nelson would give an eye roll or a disgusted look when he informed them of an appointment. (Doc. 50 at 48.) Nelson looked disgusted when Christiaens told her that his appointments would continue for quite a while. (*Id.*)

Three separate CoreCivic employees filed three separate Incident Statements complaining of Christiaens's conduct in April 2020, June 2020, and February 2021. (Doc. 50 at 9-11.) The June 2020 Incident Statement complained of Christiaens's participation in a conversation in which a CoreCivic employee referred to another CoreCivic employee as a "cougar." (Doc. 50 at 9-10); *see* (Doc. 50 at 51). CoreCivic never disciplined Christiaens in writing in relation to the April 2020, June 2020, or February 2021 Incident Statements. (Doc. 50 at 47.) Christiaens himself filed an Employee Grievance in August 2020 complaining that his supervisor Chief Joseph Henson "intimidated, threatened, [and] undermined" Christiaens "causing [Christiaens] to work in a constant fear of losing my job, Career [sic] and safety." (Doc. 50 at 54.)

Bludworth at some time during Christiaens's employment with CoreCivic instructed Christiaens to follow him to the Human Resources Department to file a complaint against Bludworth. (Doc. 50 at 35, 46.) Christiaens believed Bludworth intended to scare him. (Doc. 50 at 46.) Christiaens had tears in his eyes when he arrived at the Human Resources office. (Doc. 50 at 39.) Christiaens did not file a complaint against Bludworth but stayed in the Human Resources office for 30 to 45 minutes. (Doc. 50 at 38.) Christiaens was upset, felt fearful of losing his job, and felt anxiety because he felt he was being attacked. (Doc. 50 at 38, 46.)

Bludworth witnessed Christiaens suffer what Bludworth described as a "panic attack" while at work in September 2020. (Doc. 50 at 35.) An ambulance transported Christiaens from his workplace to a hospital. (*Id.*) Bludworth noted that Christiaens was unable to complete sentences and he was unaware of his surroundings. (*Id.*) Mayhew also saw that Christiaens was unaware of where he was or what day it was. (Doc. 50 at 41.) Christiaens missed work on September 28, 29, and 30, 2020, due to depression and anxiety. (Doc. 50 at 47.)

Christiaens "teased" coworker Diana Rangel ("Rangel") for her pronunciation of the word "dairy" on or about March 18, 2021. (Doc. 50 at 11.) Rangel is a Hispanic woman who speaks Spanish as her first language. (*Id.*)

CoreCivic staff in Shelby met at some time in March 2021 with Managing Director David Berkebile, Bludworth's supervisor, about Christiaens's mistreatment of staff. (Doc. 51-3 at 10.) Staff raised the fact at that meeting that Christiaens had allegedly been mistreated by others, including Henson. (*Id.*) CoreCivic staff requested an investigation into the mistreatment allegations. (*Id.*)

Christiaens believed he had a manic episode at work on March 24, 2021. (Doc. 50 at 47.) His mind raced and he cried at times. (Doc. 50 at 47-48.) Christiaens was admitted to a hospital psychiatric ward after work on March 24, 2021. (Doc. 50 at 48-49.) The hospital discharged Christiaens on March 25, 2021. (Doc. 50 at 49.) Christiaens told two CoreCivic employees, including Assistant Warden Catherine Nelson, that he had stayed overnight at the hospital for mental health. (Doc. 50 at 48-49.)

Nelson met with Christiaens on April 1, 2021, to discuss Christiaens's statements to Rangel regarding her English on March 18, 2021. (Doc. 50-9 at 10); (Doc. 50 at 13-14). Rangel reported to Bludworth at some point after March 18, 2021, and before Christiaens was placed on leave, that Christiaens made a comment to another coworker, Mayhugh, in front of Rangel "to [the] effect" that "the reason why I [Christiaens] like you [Mayhugh] is because you don't take things to the higher-ups[.]" (Doc. 50 at 14.) CoreCivic placed Christiaens on paid administrative leave on April 2, 2021. (Doc. 14 at 2.) CoreCivic Human Resources

requested that Rangel make a written complaint to Human Resources about Christiaens's behavior generally. (Doc. 50 at 17.) Rangel submitted an Incident Statement about Christiaens's behavior on April 2, 2021, that included a statement that "Christiaens continues to make me feel uncomfortable with his sarcastic comments about my English." (*Id.*)

Fire Investigator Leo York ("York") began an investigation of Christiaens's alleged retaliation against Rangel on April 5, 2021. (Doc. 50 at 15.) York requested that Rangel make a retroactive written complaint with Human Resources about Christiaens's retaliation, that is, his comments to Mayhugh in front of Rangel. (Doc. 50 at 17-18.) Rangel submitted an Incident Statement about the retaliation incident on April 8, 2021. (*Id.*) York requested that Rangel file a retroactive written complaint to Human Resources about Christiaens's March 18, 2021 teasing of Rangel for her accent. (Doc. 50 at 15-16.) Rangel submitted an Incident Statement about the March 18, 2021 incident sometime after April 9, 2021. (*Id.*) York issued his report on April 9, 2021. (Doc. 50 at 54.) York interviewed Christiaens on April 15, 2021, after the report had been issued. (Doc. 50 at 48.) CoreCivic never disciplined Christiaens in writing in relation to either of Rangel's complaints. (Doc. 50 at 47.) CoreCivic terminated Christiaens's employment on July 9, 2021. (Doc. 14 at 2.)

Christiaens brings four claims: violation of the Montana Human Rights Act ("Claim 1"); wrongful discharge ("Claim 2"); intentional infliction of emotional distress ("Claim 3"); and punitive damages ("Claim 4"). *See* (Doc. 3 at 4-7.)

## LEGAL STANDARD

Summary judgment proves appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, (9th Cir. 2014) 771 F3d 1119, 1125. The nonmoving party's "fail[ure] to make a showing sufficient to establish the existence of an essential element to that part[y's] case, and on which that party will bear the burden of proof at trial" warrants summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

### I. Wrongful Discharge

Wrongful discharge under the Montana Wrongful Discharge from Employment Act occurs when an employer discharges a non-probationary employee such as Christiaens without "good cause." Mont. Code Ann. 39-2-904(1)(b). "[R]easonable job-related grounds [. . .] based on [. . .] legitimate

6

business reasons" constitute "good cause." Mont. Code Ann. 39-2-903(5). A false reason cannot establish "good cause" for purposes of the Montana WDEA. *Buck v. Billings Montana Chevrolet, Inc.*, 811 P.2d 537, 540 (Mont. 1991).

CoreCivic contends that it discharged Christiaens because he violated CoreCivic's written policy against retaliation when he retaliated against Rangel through his comment to Mayhugh about not taking complaints to higher-ups. *See* (Doc. 50 at 14.) Christiaens asserts that CoreCivic's stated reason for discharging Christiaens is false. Christiaens's argument that CoreCivic's purported reason rings false comprises the presentation of an alternative theory as well as a challenge to the ability of facts in the record to support CoreCivic's argument.

The disability discrimination motive, argues Christiaens, provides a framework for viewing CoreCivic's purported cause for discharge as pretextual. Christiaens points to the rapid succession of events, including one of Christiaens's at-work mental health episodes and Christiaens's placement on administrative leave. Bludworth discussed putting Christiaens on administrative leave with Human Resources by email as early as March 24, 2021. (Doc. 50 at 34); *see* (Doc. 51-3 at 10). Also on March 24, 2021, Christiaens cried at work and checked into a hospital psychiatric ward after work. (Doc. 50 at 47-49.) Christiaens was placed on administrative leave on April 2, 2021. (Doc. 14 at 2.) CoreCivic employees prompted Rangel to submit her written complaints only *after* CoreCivic had placed

Christiaens on administrative leave. *See* (Doc. 50 at 15-18.) Christiaens "teased" Rangel about her accent on or around March 18, 2021. (Doc. 50 at 11.)

It remains plausible that Bludworth's March 24, 2021 request to put Christiaens on administrative leave stemmed from a legitimate business reason, such as to ensure a harassment-free workplace for Rangel and other employees. The record still contains sufficient factual disputes to suggest an alternate understanding, that CoreCivic's handling of the aftermath of Rangel's verbal report of retaliation evinces not principled action in the interest of the business but an effort to push Christiaens out because of his observed mental health issues.

Seeming inconsistencies surrounding the purported anti-retaliation cause for discharge also give rise to factual questions properly left to the jury. Christiaens points to a factual dispute as to the nature of his "teasing" of Rangel. Christiaens asserts that rather than harassing Rangel, Christiaens had helped Rangel understand what the English word "dairy" meant then jovially teased her prompting Rangel to laugh. (Doc. 50 at 48-49.) Christiaens also highlights: 1) that CoreCivic authority figures prompted Rangel to take certain acts, including to pen both of her written Incident Statements (Doc. 50 at 15-18); 2) that Rangel's written Incident Statement alleging Christiaens joked about her accent was written both well after the events it describes and after Christiaens had been placed on administrative leave (Doc. 50 at 15-16); and 3) that the Incident Statement alleging Christiaens joked about

8

Rangel's accent contains errors including the listing of a different facility (Doc. 50 at 52), the wrong backdate (Doc. 50 at 53), and the omission of a signature (Doc. 50 at 16). Christiaens also notes that Christiaens believes CoreCivic failed to follow its progressive discipline process in handling complaints about Christiaens. (Doc. 50 at 50-51.)

These points may be mustered to support the suggestion that Christiaens's comments to Rangel did not offend Rangel, but that CoreCivic management used Rangel's experience as a convenient method for getting rid of Christiaens. Elements of the record seen in one light as decisive action or meaningless bureaucratic mistakes may in another light appear as evidence of a slipshod campaign to rid CoreCivic of a disfavored employee as quickly as possible and only papering over that action later with after-the-fact documentation.

A genuine dispute exists as to a material fact: whether CoreCivic's purported "good cause" reason for discharging Christiaens proves false. The record lends itself to reasonable interpretations consistent with finding liability as to wrongful discharge or not. "The balance between the employer's discretion and the employee's equally legitimate right to secure employment should favor an employee who presents evidence [. . .] upon which a jury could determine that the reasons given for his termination were false[.]" *Reinlasoder v. City of Colstrip*, 376

P.3d 110, 113 (Mont. 2016) (internal quotations omitted). No summary judgment can issue as to Christiaens's wrongful discharge claim.

## II.   Montana Human Rights Act

Liability attaches under the Montana Human Rights Act when an employer discriminates in employment against a person because of mental disability. Mont. Code Ann. § 49-2-303(1)(a). A "mental disability" is a "mental impairment that substantially limits one or more of a person's major life activities," the "record of such an impairment," or a "condition regarded as such an impairment." Mont. Code Ann. § 49-2-101(19)(a). Courts must construe the phrase "substantially limits" in the Montana Human Rights Act "broadly in favor of expansive coverage." *Est. of Welch* at 282. To survive a summary judgment challenge, a plaintiff must "produce evidence that establishes a prima facie case [of discrimination], as well as evidence which raises an inference that the defendant employer's proffered [legitimate, nondiscriminatory] reason is pretextual." *Reeves v. Dairy Queen, Inc.*, 953 P.2d 703, 706 (Mont. 1998).

Christiaens presents evidence that a reasonable jury could find that CoreCivic discriminated against him because CoreCivic regarded Christiaens as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *See Est. of Welch v. Holcim, Inc.*, 316

P.3d 823, 828 (Mont. 2014). CoreCivic knew of Christiaens's mental impairments. Christiaens told CoreCivic management about his mental health appointments (Doc. 50 at 45, 48, 55). Bludworth knew that Christiaens suffered from stress and anxiety (Doc. 50 at 33). Bludworth witnessed what he believed to be Christiaens suffering a "panic attack" (Doc. 50 at 35). CoreCivic staff noticed mental impairment symptoms, including Christiaens's frequent mood changes. (Doc. 50 at 43, 53.)

A factual dispute exists as to the extent to which CoreCivic believed Christiaens's mental impairment restricted his ability to perform the functions required of the managerial class of jobs. *See Butterfield v. Sidney Pub. Sch.*, 32 P.3d 1243, 1245-1246 (Mont. 2001) ("that class of jobs which requires heavy physical labor" constitutes a "class of jobs"); *but see Est. of Welch* at 829 (restriction from working a night shift not a restriction from "a class of jobs or a broad range of jobs"). Bludworth requested to place Christiaens on paid administrative leave after Bludworth had witnessed Christiaens's "panic attack," and on the same day that Christiaens cried at work. (Doc. 50 at 34); *see* (Doc. 51-3 at 10.) "[C]onduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 946 (9th Cir. 2015) (internal quotations omitted).

Christiaens points to sufficient evidence to "raise[] an inference that the defendant employer's proffered reason [for Christiaens's treatment] is pretextual." *Reeves* at 706. In addition to the reasons detailed above in the discussion of Christiaens's WDEA claim, Christiaens offers evidence that Henson and Nelson, CoreCivic supervisors, expressed disgust at Christiaens's continuing therapy appointments. (Doc. 50 at 48.) Christiaens later informed Nelson of his overnight hospital visit for mental health on March 24 to 25, 2021. (*Id.* at 48-39.) CoreCivic placed Christiaens on administrative leave within a week of his overnight hospital stay. (Doc. 14 at 2); *compare NorVal Elec. Coop. Inc. v. Lawson*, 523 P.3d 5, 18, (Mont. 2022), *reh'g denied* (Jan. 24, 2023) (in an MHRA claim alleging retaliation, "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the *timing* and the *surrounding circumstances*") (emphasis added).

### III. Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress occurs under Montana law when a defendant's intentional act or omission causes a plaintiff "serious or severe emotional distress" that was a "reasonably foreseeable consequence" of the act or omission. *Sacco v. High Country Indep. Press, Inc.*, 896 P.2d 411, 429 (Mont. 1995). Plaintiff's emotional distress must prove "so severe that no reasonable person could be expected to endure it." *Childress v. Costco Wholesale Corp.*, 493

P.3d 314, 316 (Mont. 2021) (citing Restatement (Second) of Torts § 46 cmt. J). A court "must determine first whether the evidence supports a finding of severe emotional distress." *McGinnis v. City of E. Helena*, 63 P.3d 512 (Mont. 2002). A court must "careful[ly] consider[] the circumstances under which the infliction [of emotional distress] occurs and the relationship of the parties involved in order to determine when and where a reasonable person should or should not have to endure certain kinds of emotional distress." *Maloney v. Home & Inv. Ctr., Inc.*, 994 P.2d 1124, 1135 (Mont. 2000).

Christiaens directs the Court to three acts by CoreCivic or its agents as causing Christiaens emotional distress, *see* (Doc. 49 at 29-30): 1) Bludworth's conduct of making Christiaens visit the Human Resources office and instructing Christiaens to file a Human Resources complaint against Bludworth (Doc. 50 at 38-46); 2) Chief Henson's derision of Christiaens in front of other employees (Doc. 50 at 54-55); and 3) Bludworth's accusation in front of other employees that Christiaens had committed sexual harassment (Doc. 50 at 46-47).

The plaintiff in *McGinnis*, a former chief of police, asserted an intentional infliction of emotional distress claim stemming from alleged mistreatment by his work supervisor, the mayor. 63 P.3d at 512. The record included evidence that the mayor had remarked on the plaintiff's weight, threatened to demote the plaintiff because he was unable to return full-time after a surgery, and announced at an

13

office party that the plaintiff did not "need to eat that—your [plaintiff's] stomach is big enough already." *Id.* The plaintiff proffered evidence that he took anti-depressant medication and had remained under the care of a psychiatrist due to the mayor's harassment. *Id.* The Montana Supreme Court considered the sporadic nature of the alleged harassment over a two-year period, the continuation of the working relationship between the plaintiff and the mayor, and the fact that threats of demotion and wage withholding appeared to have been "idle, one-time events" in analyzing whether the mayor's conduct could have inflicted "serious and severe" emotional distress. *Id.* The Montana Supreme Court concluded that the plaintiff had failed to "meet his burden," in part, because he had failed to present "evidence to connect his psychological treatment to underlying causes related to the alleged harassment." *Id.*

The Montana Supreme Court concluded, on the other hand, that the plaintiffs in *Czajkowski v. Meyers*, had made out a case for intentional infliction of emotional distress sufficient to clear the hurdle of a summary judgment challenge. 172 P.3d 94 (Mont. 2007). The plaintiffs suffered from symptoms including loss of sleep, weight loss, apprehension of going outside their home, and shaking hands due to a "four [] year campaign" of "incessant" verbal assaults and surveillance by their neighbors. *Czajkowski* at 101-103.

The record lacks support for the proposition that Christiaens could have suffered "serious or severe" emotional distress. Christiaens experienced discomfort like that of the *McGinnis* plaintiff, not like that of the *Czajkowski* plaintiffs. The gravity of Christiaens's complaint as to Bludworth's act of making him go to the Human Resources office hinges on Bludworth's "idle, one-time" insistence that Christiaens file an Employee Grievance against him. *See* (Doc. 50 at 46.) Bludworth's comment in front of CoreCivic employees insinuating that Christiaens was a sexual harasser resembles the office party comment in *McGinnis*. 313 Mont. at 420. Chief Henson's complained-of conduct likewise appears substantially similar, at worst, to the conduct at issue in *McGinnis*. *Id.* Summary judgment proves warranted as to intentional infliction of emotional distress.

"[S]ome degree of transient and trivial emotional distress is a part of the price of living among people." Restatement (Second) of Torts § 46 cmt. J. The slings and arrows of the workplace offer ample sources of such transient and trivial distress, but a workplace context does not transform everyday distress into the type that is actionable at law. *See McGinnis*; *cf. Jackson v. Health Res. of Rockville, Inc.*, 357 F. Supp. 2d 507, 521 (D. Conn. 2005) (applying a different test also derived from Restatement (Second) of Torts § 46 to find proper summary judgment for defendant where plaintiff nurse's aide was "falsely accused of patient abuse twice, falsely disciplined, disciplined for behavior that others were not

15

disciplined for, the subject of a campaign to terminate her or make her resign, and the subject of offensive remarks"); *see also Reid v. Dalco Nonwovens, LLC*, 154 F.Supp.3d 273, 297 (summary judgment for defendant, applying North Carolina law that distress inflicted must be "so severe that no reasonable man could be expected to endure it").

The Court notes that nothing in the record suggests that Christiaens thought seriously about quitting his job or attempted to quit his job after the complained-of conduct. Quitting a job represents a step that a reasonable person suffering otherwise unendurable emotional distress might take in an attempt to lessen the distress caused in an employment context. Likewise, no evidence in the record suggests that Christiaens filed any Human Resources complaint against Bludworth for his complained-of conduct although Christiaens knew how to file complaints and had done so in the past. See (Doc. 50 at 38) ("Christiaens did not write an Incident Report or Employee Grievance" after Bludworth caused him to go to the Human Resources office); *compare* (Doc. 50 at 54-55) (discussing Christiaens's 5-1C Incident Statement and Employee Grievance complaining of Chief Henson's conduct). The lack of such evidence is not dispositive but does support the Court's finding that no genuine issue of material fact exists as to the Intentional Infliction of Emotional Distress claim.

**IV. Punitive Damages**

Montana law permits the award of punitive damages only when a defendant committed "actual fraud" or "actual malice." Mont. Code Ann. § 27-1-221; *Romo v. Shirley*, 522 P.3d 401, 413 (Mont. 2022). Actual fraud exists when 1) either a defendant "makes a representation with knowledge of its falsity" or "conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury"; 2) a "plaintiff has a right to rely on the representation of [a] defendant"; 3) a plaintiff relies on the representation; and 4) the plaintiff's reliance causes the plaintiff injury. Mont. Code Ann. § 27-1-221(3), (4). Actual malice exists when a defendant knows of or "intentionally disregards facts that create a high probability of injury to the plaintiff" and deliberately acts either "in conscious or intentional disregard of" or "with indifference to the high probability of injury to the plaintiff." Mont. Code Ann. § 27-1-221(2). All elements of a punitive damages claim "must be proved by clear and convincing evidence[, meaning] evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Mont. Code Ann. § 27-1-221(6).

Christiaens fails to demonstrate that a genuine issue of material fact exists as to whether CoreCivic committed either "actual fraud" or "actual malice." Christiaens points to no knowingly false or material-fact-concealing CoreCivic representation in the record upon which Christiaens possessed a right to rely and

17

actually did rely to Christiaens's injury. *See* (Doc. 49); *compare Romo v. Shirley*, 522 P.3d 401, 415 (Mont. 2022). Christiaens likewise fails to direct the Court to evidence that a reasonable jury could find shows that CoreCivic deliberately acted in conscious disregard of or indifference to known or intentionally disregarded facts creating a high probability of injury to Christiaens. *See* (Doc. 49); *compare Matter of Est. of Cote*, 433 P.3d 221, 231-232 (Mont. 2019).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex* at 323-324. Christiaens "fails to make a showing sufficient to establish the existence of an essential element to [Christiaens's punitive damages claim]." *Celotex* at 322. The Court notes that Christiaens failed to respond at all in his briefing to CoreCivic's Rule 56 challenge to his punitive damages claim. *See* (Doc. 49). Christiaens informed the Court, when asked at the hearing on this motion, that he wished to proceed with his punitive damages claim. The statement provided by Local Rule 7.1(d)(1)(B)(ii) that "failure to file a response brief may be deemed an admission that the motion is well-taken," though, confirms the Court's judgment as to Christiaens's punitive damages claim. Summary judgment proves warranted as to punitive damages.

## ORDER

**IT IS ORDERED**:

CoreCivic's Motion for Summary Judgment (Doc. 36) is **GRANTED in part and DENIED in part**.

**DATED** this 24th day of April, 2024.

_____
Brian Morris, Chief District Judge
United States District Court